Paul A. Turcke, ISB No. 4759
Carl J. Withroe, ISB No. 7051
MOORE SMITH BUXTON & TURCKE, CHARTERED
950 W. Bannock St., Ste. 520
Boise, ID 83702
Tel: 208-331-1800
Fax: 208-331-1202
pat@msbtlaw.com; cjw@msbtlaw.com

Counsel for Amici Recreation Groups

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE and THE WILDERNESS SOCIETY<br><br>Plaintiffs,<br>v.<br><br>FRANK V. GUZMAN, Forest Supervisor, Salmon-Challis National Forest; UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture,<br><br>Defendants,<br><br>IDAHO STATE ATV ASSOCIATION, IDAHO STATE TRAIL MACHINE ASSOCIATION, IDAHO RECREATION COUNCIL, and BLUERIBBON COALITION,<br><br>Amici-Curiae. | Case No. CV 10-26-REB<br><br>MEMORANDUM OF AMICI CURIAE ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

The Salmon-Challis Travel Plan is the universally-unpopular product of an extensive public planning process which should be upheld by this Court. This matter is before the Court on cross-motions for summary judgment. This brief is presented by a

coalition of recreational organizations who have been granted *amici* status, namely the Idaho State All Terrain Vehicle Association, Idaho State Trail Machine Association, Idaho Recreation Council and BlueRibbon Coalition (the "Recreation Groups"). Mindful of their role as amici, the Recreation Groups will not attempt an exhaustive or authoritative analysis of Plaintiffs' motion, but will highlight important defects and speak from their unique perspective as recreationists familiar with motorized recreation on the Forest. The Forest Service considered all relevant factors, provided ample opportunity for public input, and demonstrated at least a rational choice in rendering the final balance. The standard of review is highly deferential to a reasoned exercise of broad agency discretion, and the Court should deny Plaintiffs' motion, grant Defendants' motion, and affirm the validity of the Travel Plan.

## II. ARGUMENT

The validity of the Travel Plan is not measured by its popularity or the Forest's failure to yield to the input of disgruntled special interests. The Court should reject Plaintiffs' challenges and declare the Plan valid.

### A. Plaintiffs Oversimplify the Legal Framework and Agency Duty to Balance.

Plaintiffs predictably emphasize preservation of natural resources and "environmental" issues in mischaracterizing the agency's multiple-use mandate. *See*, *e.g.*, Plaintiffs' Br. (Doc. No. 38-1) at 1 (characterizing case as being "about the failure of the defendants…to avoid permanently diminishing [the Forest's] remarkable and irreplaceable public legacy of natural resources.") There are several truths inconvenient to Plaintiffs' thesis. The Travel Plan <u>reduces</u> the locations upon which motorized

vehicles can travel.[1] Plaintiffs therefore fail to explain how this reduction of motorized travel will threaten "permanent" impact(s) to "irreplaceable" resources beyond those occurring during the decades of greater (including cross-country) motorized travel that preceded the Travel Plan. Additionally, the legal framework behind the Travel Plan requires the Forest to strike a balance between various uses of the public lands, not to emphasize preservation/wilderness as Plaintiffs imply.

The Forest Service is required by law to make decisions based on a multiple-use mandate, as outlined in statutes like the Multiple-Use Sustained Yield Act of 1960 ("MUSYA") and the National Forest Management Act ("NFMA"). In particular, NFMA requires:

> In developing, maintaining, and revising plans of the National Forest System pursuant to this section, the Secretary shall assure that such plans-
>
> (1) provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with [MUSYA], and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness…

NFMA §6, 16 U.S.C. § 1604(e). MUSYA provides further clarification of the agency's duty to provide for "use" of the National Forest System, including outdoor recreation. MUSYA's policy statement explains:

> It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and

---

[1] The "existing condition" prior to the Travel Plan "consist[ed] of about 2,900 miles of open Forest system roads, about 1,120 miles of motorized system trails, about 2,700 miles of unauthorized routes, and approximately 980,423 acres open to cross-country travel." AR 46281 (FEIS at S.8). The alternative allowing the greatest amount of motorized access, questionably entitled the "no action" alternative, would have designated 5,147 miles of motorized routes, versus the 6,720 mile figure derived by adding the "existing condition" route mileages. The selected alternative 5 designated 3,534 total miles of routes for motorized travel, roughly a 47 percent reduction of motorized route mileage from the existing condition. *See*, AR 46285 (FEIS at S.12).

> wildlife and fish purposes. The purposes of sections 528 to 531 of this title are declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in section 475 of this title…

MUSYA §1; 16 U.S.C. § 528. A robust analysis is contemplated, for MUSYA states that "sustained yield" "means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land." 16 U.S.C. § 531(b). In discharging these duties, the Secretary shall give "due consideration…to the relative values of the various resources in particular areas." 16 U.S.C. § 529.

These guiding principles must typically be applied through procedures which comply with the National Environmental Policy Act ("NEPA"). NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1. Plaintiffs, like many, focus their discussion on protection of the natural and physical environment, but NEPA embodies a Congressional desire "to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of future generations of Americans." 42 U.S.C. § 4331(a). NEPA's operative EIS requirement is triggered by federal action which may "significantly affect[ ] the quality of the <u>human</u> environment…." *Id.* at § 4332(2)(C) (emphasis added). The "human environment" "shall be interpreted comprehensively to include the natural and physical environment and <u>the relationship of people with that environment</u>." 40 C.F.R. § 1508.14 (emphasis added). NEPA is a purely procedural statute designed to "insure that environmental information is available to public officials and citizens before decisions are made and

before actions are taken." 40 C.F.R. § 1500.1(b); *see also*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

These duties are further refined and embodied in the Final Rule giving rise to the Travel Plan. *See*, *generally*, Travel Management: Designated Routes and Areas for Motor Vehicle Use, 69 Fed.Reg. 42381 (July 15, 2004); 70 Fed.Reg. 68264 (November 9, 2005) (the "TMR"). The TMR begins from the premise, upon which hopefully all could agree, that "[m]otor vehicles are a legitimate and appropriate way for people to enjoy their National Forests- in the right places, and with proper management." 70 Fed.Reg. 68264. Thus, the "final rule does not encourage or discourage motor vehicle use, but rather requires designation of roads, trails, and areas for motor vehicle use. The Department believes that a well-designed system of routes and areas designated for motor vehicle use can reduce maintenance needs and environmental damage, while enhancing the recreational experience for all users, both motorized and nonmotorized." *Id.* at 68271.

The Forest Service faces a complex task in evaluating vehicle use and making designations, implicating interdisciplinary analysis of myriad natural resource and sociopolitical factors. The TMR distills this analysis to "general" and "specific" criteria, which theoretically create substantive sideboards on any designations. The "general criteria" which "shall be considered" in making designations are:

> effects on National Forest System natural and cultural resources, public safety, provision of recreational opportunities, access needs, conflicts among uses of National Forest System lands, the need for maintenance and administration of roads, trails and areas that would arise if the uses under consideration are designated; and the availability of resources for that maintenance and administration.

36 CFR § 212.55(a) (2007). The "specific criteria" carry forward the "minimization" duties of Executive Orders 11644 and 11989 (issued by Presidents Carter and Nixon, respectively) (*see*, 42 Fed.Reg. 26959), and direct:

> the responsible official shall consider effects on the following, with the objective of minimizing:
> (1) Damage to soil, watershed, vegetation, and other forest resources;
> (2) Harassment of wildlife and significant disruption of wildlife habitats;
> (3) Conflicts between motor vehicle use and existing or proposed recreational uses of [NFS] lands or neighboring Federal lands; and
> (4) Conflicts among different classes of motor vehicle uses.

36 CFR § 212.55(b) (2007). Section 212.55 further identifies some "additional criteria" relating to transportation issues such as sound, emission, speed, traffic and clarifies that valid existing rights and rights of use must be recognized in any designations and that vehicle use cannot be designated in wilderness areas.

The broader legal and regulatory context is important in evaluating the Travel Plan. The standard of review turns on whether the agency considered "relevant factors" or "important aspect[s]" of the particular issue[s] before it. *See*, *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc). Those factors, in the context of the Travel Plan, include providing appropriate human access, recreation opportunity, and related socioeconomic analyses, not the single-minded preservation mandate that Plaintiffs might prefer. Prior to the Travel Plan, a far more extensive motorized route network was available to amici and the public. The Travel Plan is not even a "split" between uses, for nonmotorized recreational uses can still occur throughout the entire Forest and now have exclusive use of a greater portion of the Forest versus shared access with motorized vehicles on a now-smaller portion. Plaintiffs focus on additional routes

they want closed to motorized use but fail to acknowledge the Plan's significant closures and the agency's good faith effort at striking a balance conforming to the law.

**B. The Travel Plan Represents a Reasoned Solution to a Solomonic Challenge.**

At the most basic level, the Travel Plan's success (or at least its legal sufficiency) is reflected by its unanimous unpopularity with engaged special interests. Only Plaintiffs have chosen to elevate their dissatisfaction to the point of filing suit, but the Recreation Groups and others seeking greater access opportunities actively participated in the administrative process and challenged the final decision through the administrative appeal process. For example, the Recreation Groups and various member organizations submitted comments throughout the planning process, including detailed maps and route-specific comments. *See*, *e.g.*, AR 10730-10733 (Off-Road Business Assoc.); AR 42059-42063 (correspondence from ORBA); AR 42068-42072 (Magic Valley ATV Riders); AR 42417-42429; AR 43735-43743 (Treasure Valley Trail Machine Assoc.); AR 43876-43887 (ORBA); AR 43905-43954 (BlueRibbon Coalition); AR 44197- 44210 (BlueRibbon, Motorcycle Industry Council, Specialty Vehicle Institute of America). Some of these commenters administratively appealed the final decision. *See* AR 47308-47318. Similarly, many other interest groups or entities expressed dissatisfaction with the Travel Plan. *See*, *e.g.*, AR 47212-47223 (Custer County); AR 47230-47233 (Lemhi County); AR 47376-47381 (Tri-County Cattlemen's Assoc.). The Travel Plan is far from the outcome sought by motorized access interests.

In the end, it is perhaps this wide-ranging discomfort with the Travel Plan that reflects its balance. This is a classic case where the agency "can't please all of the people all of the time." *Hells Canyon Alliance v. U.S. Forest Service*, 227 F.3d 1170, 1172 (9th

Cir. 2000). Aside from the ample bases upon which to reject Plaintiffs' legal claims, a ruling in Plaintiffs' favor would create a perverse incentive and further complicate effective public lands management. In fact, Plaintiffs took full advantage of their opportunity to participate, and were even given unique opportunities, after the close of public comment, to have a face-to-face meeting with agency officials. *See*, AR 42621-43615 (964-page DEIS comments from Plaintiffs); AR 44253-44265 (powerpoint presentation from post-deadline January 22, 2009 meeting in Stanley). Plaintiffs emphasize the agency's unwillingness to fundamentally change the structure of the EIS after this meeting, seemingly oblivious to the legal effect potentially created by capitulation to their request. *Compare* AR 44265 (final slide, Issue #2, "routes we identified for resource concerns were not evaluated for closure in any of the action alternatives") with *Russell Country Sportsmen v. U.S. Forest Service*, 2010 WL 889870 (D. Mont. 2010) at *2-*3 (finding travel plan violated NEPA when it "closed several trails not specified for closure [in any alternative] in the DEIS"). The agency invested years and at least hundreds of thousands of public dollars in generating the Travel Plan. Plaintiffs apparently expected the agency to respond solely on their input, which would have necessitated scrapping the DEIS and issuing a time-consuming and costly supplement or inviting the same risk as in *Russell Country Sportsmen*.

The Forest conducted an extensive analysis that included robust public input, and not surprisingly rejected Plaintiffs' heroic efforts to be heard over the throng of competing interests. The Court should respect the balance selected by the agency.

### C. Plaintiffs Seek to Improperly Create "Mandatory" Duties to Minimize Impacts or Immediately Close Routes.

Plaintiffs contend that the Forest Service violated "mandatory" duties to minimize impacts or immediately close routes. *See*, Plaintiffs' Br. at 20-30 and 30-31. These claims have been rejected by other courts and should be rejected here.

Regardless of whether Plaintiffs' argument is construed to invoke the Executive Order or TMR provisions addressing any duty to minimize impacts, their argument fails. Plaintiffs do not articulate what level of impact constitutes a "minimum" impact, although it is clear that such a level is far below the impact that Plaintiffs contend will flow from the overall mileage or location of routes in the Travel Plan. Regardless, virtually an identical claim has been considered and rejected. In a challenge to a similar travel planning decision in the Eldorado National Forest in northeastern California, the court evaluated both Executive Order 11644 and the precursor regulations to the TMR and concluded:

> While it is certainly true that Executive Order 11644 created a policy striking a balance in favor of resource protection, it also mandated that "[o]ff-road vehicle management plans shall…provide for diverse use and benefits of the National Forests…." 36 CFR § 295.2(b) (2005). Therefore, while minimizing environmental damage "is mandatory as to the object to be achieved,…it leaves [the Forest Service] a great deal of discretion to decide how to achieve it."

Order (Doc. No. 139) at 57 (filed Feb. 17, 2005); *Center for Sierra Nevada Conservation v. Berry*, Case No. 02:CV-325-LKK-JFM (E.D. Cal.) (attached hereto as Exhibit "A") (bracketing and ellipses in original, quoting *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004)). Against the argument that alternatives other than the one ultimately selected would have designated fewer routes and allegedly thereby "minimized" impacts vis-à-vis the agency decision, the *Berry* court deferred to the Forest Service's exercise of discretion, noting that "[r]eviewing courts must be mindful that they

many not substitute their own judgment for that of the federal agency and may overturn its decision only if it was arbitrary or capricious." *Id.*

The decision in the still-pending case *Center for Biological Diversity v. U.S. BLM*, Case No. 06:CV-4884-SI (N.D. Cal.) ("*CBD*") is readily distinguishable. Any violation of the minimization duty there turned on the unique procedural context, which involved a Bureau of Land Management "decision tree" analytical process that defined whether a route would be proposed open or closed but offered no analysis of any factor other than those identified at each "branch" of the decision tree process. *See*, *CBD* (attached as Exhibit B to Plaintiffs' Br. (Doc. 38-3)) at 24-25 (explaining that routes designated "open" via code SO-3 would have been evaluated for only the specified criteria, which omitted many of the "minimization" criteria). While BLM contended that an overall analysis was conducted that included the full minimization criteria the court disagreed, finding "nothing in the record documents that anything other than the Decision Tree questions and the route-type and recreation data collected during the on-the-ground surveys determined the designation of routes." *Id.* at 28. The "decision-tree"-dependent BLM analysis in *CBD* represents a unique method different from that employed by the Forest Service here. The DEIS and FEIS demonstrate that the Forest Service performed the over-arching consideration (lacking in *CBD*) of a full range of "human environmental" elements, which include all of the minimization criteria. The distinction is apparent in comparing the range of alternatives in *CBD*, which was found legally deficient because all seven (7) alternatives included the same 5,098-mile route network produced via the Decision Tree, as opposed to the variation in route mileages considered

in the Forest's Travel Plan. *CBD* represents a unique outcome following a uniquely-flawed planning process.

Plaintiffs seemingly acknowledge the broad-based nature of the Forest's analysis here, but contend that it failed to reflect a "discernible path" toward the agency's decision. *See* Plaintiffs' Br. at 29-30. The primary flaw in Plaintiffs' argument is that it focuses on the alleged inadequacy of the information presented by Plaintiffs. *Id.* at 30 ("the record is devoid of any explicit, let alone meaningful, discussion of how the Forest Service considered or addressed the site-specific, significant impacts identified by ICL and others…."). This argument inverts the analytical process and would put the burden on the agency to specifically rebut allegations by interested participants. Put differently, it would create a "presumption of irregularity" that agency silence on some special interest perspective equates to arbitrary and capricious behavior. In reality, it is the evidence the agency considered that determines whether its outcome was reasoned. What matters is the sufficiency of the Forest's evidence, not the Forest's response to Plaintiffs' "evidence." Here the agency considered a wealth of information, albeit to the dissatisfaction of many.

Plaintiffs' effort to create a mandatory duty to immediately close must similarly fail. This claim is effectively a disguised "failure to act" claim that is all but extinct following *SUWA* outside anything but a true mandamus scenario involving a failure to conduct a plainly-prescribed, ministerial act. While the regulations may allow the Forest Service to immediately close routes/areas under narrow circumstances, agency action invoking that authority is a far cry from Plaintiffs, through the Court, directing the agency to act a certain way at a specific location. Plaintiffs fail to identify "a *discrete* action that

[the Forest] is *required to take*." *SUWA*, 542 U.S. at 64 (italics in original). It is useful to review the district court decision in *SUWA*, ultimately vindicated in large part by the Supreme Court, which reasoned that "BLM is aware of the impairment caused by ORV use, and it is, at least, attempting to perform a complex balancing of many factors that bear on this issue." *SUWA v. Babbitt*, 2000 WL 33347722 at *5 (D. Utah 2000), *rev'd*, 301 F.3d 1217 (10th Cir. 2002), *rev'd by*, *Norton v. SUWA*, 542 U.S. 55 (2004). The court outlined some of the many factors, concluding they "must be considered, by those with expertise and professional judgment, in arriving at the most effective solution to the problems." *Id.* The "immediately close" argument entails multiple "judgment calls" involving Plaintiffs' hand-picked "evidence", whether the same reflected "considerable adverse effects" and whether immediate closure (or any action) was warranted.

Plaintiffs' arguments fail to identify agency abdication of mandatory duties, but only disagree with the manner or pace of agency action. Plaintiffs' desired remedy is unclear at this point, but their claims seem to ask the Court to determine that the evidence is so clear as to require a Court order directing closure of specific routes/areas to motor vehicle use. Other courts have determined this result improperly places the court within the sphere of agency management. This Court should employ similar reasoning in rejecting Plaintiffs' claims.

**D. Plaintiffs' "Subpart A" Challenges Must Fail.**

Plaintiffs attempt to unveil a new litigation trap through the Forest's alleged failure to comply with "subpart A" of the TMR. Plaintiffs contend first that the Forest failed to perform a required procedural step in explicitly identifying and marking off a subpart A checklist when issuing the Travel Plan. Plaintiffs' Br. at 25-30. Plaintiffs next

contend that the Travel Plan violates any substantive requirement in subpart A because the Travel Plan has designated something beyond the minimum road system. *Id.* at 30-35. This Court should decline Plaintiffs' invitation to create new law.

The minimum road system language now relied upon by Plaintiffs has long existed and has never given rise to any claims like those attempted here. The essential provisions are located in 36 CFR § 212.5(b)(1). *See*, Plaintiffs' Br. at 24. In particular, Plaintiffs point to the language requiring the responsible official to "identify the minimum road system needed for safe and efficient travel and administration, utilization and protection of National Forest System lands." 36 CFR § 212.5(b)(1)(2007). The regulation further addresses the process by which the minimum road system is to be determined, indicating it will be "science-based", at "the appropriate scale", involve the public, be designed to meet "resource and other management objectives", "applicable statutory and regulatory requirements", "to reflect long-term funding expectations" and "to ensure that the identified minimum system minimizes adverse environmental impacts associated with road construction, reconstruction, decomissioninig, and maintenance." *Id.* The Forest's litigation risk of compliance should be inversely proportional to the breadth of this language.

Several broad-level observations limit, if not condemn, Plaintiffs' invocation of subpart A. The language at issue does not reflect a new mandate of the TMR. Rather, virtually the identical language pre-dated the TMR, and to counsel's knowledge has never been presented to any reviewing court or even formed the basis for significant discussion in generations of travel planning decisions. *Compare*, 36 CFR § 212.5(b)(1)(2005) with 36 CFR § 212.5(b)(1)(2006). It seems unlikely that Plaintiffs

should achieve a "gotcha" moment in this litigation through language which has gone virtually unnoticed for so long.

Again, the general guidance of *SUWA* seems applicable here. Plaintiffs' effort to exploit the alleged failure to consider or ultimately adopt a minimum road system seems comparable to an allegation that the respective officials failed to acknowledge duties to achieve and maintain a thriving natural ecological balance or preserve and perpetuate knowledge and understanding of the history of jazz. *SUWA*, 542 U.S. at 67. In fact, the subpart A regulations do not plainly prescribe the connection to the "subpart B" process that was added by the TMR. It is the agency's duty to initially interpret the regulation, and the agency might rationally conclude that a minimum road system determination might, or even must, occur outside of the subpart B site-specific evaluation of individual routes. Such an interpretation seems consistent with the seemingly-indisputable fact that the language in section 212.5 refers exclusively to <u>roads</u>. *See*, 36 CFR 212.1 (defining "road" as "[a] motor vehicle route over 50 inches wide, unless identified and managed as a trail."). The distinction between "roads" and "trails" is significant in this context, for many of the routes under analysis are designated as "trails" to be exclusively by vehicles less than 50 inches wide. *See*, AR 46285 (table comparing alternatives and separately cataloguing "system roads" and "motorized system trails"). The omission of trails in section 212.5 appears both intentional and meaningful, for other sections of subpart A refer to broader elements of the transportation system. *See*, 36 CFR § 212.2(b) (addressing forest transportation atlas, which addresses "the existence and condition of roads, trails, and airfields…."). Plaintiffs seemingly envision a world in which the agency official must explicitly and preliminarily determine the minimum road system as

a foundation for subpart B analysis. This approach may be backwards- it may be illogical to identify a road network prior to finalizing the more detailed analysis of trails via subpart B.

Plaintiffs' procedural challenge asserts that the Forest failed to adequately inform the public of the agency's duties under subpart A, thereby precluding meaningful public involvement and a fully-informed agency decision. Plaintiffs' argument suffers an important practical flaw – Plaintiffs vigorously participated, and raised subpart A concerns in their input on the Travel Plan. *See*, AR 10388 (Wilderness Society scoping comments citing section 212.5(b)(1)); AR 47341-47348 (joint appeal by both Plaintiff organizations presenting detailed subpart A arguments). While a "bait and switch" or "hide the ball" NEPA argument might be conceivable on some hypothetical record, Plaintiffs' procedural argument is belied by their record of participation here.

Plaintiffs' substantive challenge also fails. The language relied upon by Plaintiffs covers a vast spectrum of factors implicating a correspondingly vast expanse of agency discretion. In the end, a substantive minimum road system argument should be evaluated similarly to the related minimization of impacts argument. Neither can realistically interpreted in a linguistic vacuum that would interpret "minimum" to be as close as physically possible to zero. Instead, a reviewing court conducts only arbitrary and capricious review to determine whether the agency reasonably interpreted the statute or regulations in performing its analysis and reached rational conclusions in the analysis it chose to perform. Plaintiffs' substantive challenge to the minimum road system determination represents little more than the oft-rejected tactic of second-guessing the agency's technical conclusions.

Plaintiffs ultimately present fundamentally inconsistent arguments. At one level they contend that critical elements of the decisionmaking process were omitted, so that the public was denied participation or blindsided by the final outcome. However, at the same time they point to their impressive, maybe unprecedented, level of site-specific detail and input and complain of the Forest's failure to adopt their analysis in place of Forest specialists. These irreconcilable pillars create an unsturdy foundation, even in a world which allows alternative argument. And reveal a broader truth – that Plaintiffs hope to effect an ideological victory under the guise of technical legal analysis. The Court should see through this tactic, recognize the Herculean effort attempted by the Forest, and through a ruling in Defendants' favor make incrementally less attractive the prospect of asking the judiciary to tip the balance in the never-ending dispute over the allocation of public land recreational opportunities.

**E. Any Remedy Will Require a Distinct and Specialized Inquiry.**

Amici may not have further opportunity to provide input and wish to clarify the nature of any remedy in a case of this nature. The Court should not grant Plaintiffs' summary judgment motion, but if the Court does, a distinct and specialized additional phase of proceedings will be necessary to determine the appropriate remedy.

This case, like others considering public land travel planning, presents unique circumstances. Many cases addressing remedy in the context of APA review embody the proposition that the invalidation of an agency rule/action compel the vacatur of that decision and the institution of the pre-decisional status quo. *See*, *Paulsen v. Daniels*, 413 F.3d 999 (9th Cir. 2005). However, this approach creates a conundrum, for the pre-decisional status quo involved significantly more motorized access— in fact more than

twice as much— than is allowed under the Travel Plan. As a result, courts sometimes rely on their equitable jurisdiction to seek "a combination and refinement of remedies" designed "to mitigate the impact on the environment pending compliance with NEPA" while leaving the challenged plan (and underlying activities) substantially in place. *High Sierra Hikers Ass'n v. Powell*, 2001 WL 1382176 at *6 (N.D.Cal. 2001), *aff'd*, 390 F.3d 630 (9th Cir. 2004). However, this balancing effort may be at least as precarious as that faced by the agency, for under NEPA "[t]he only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' " *Sierra Club v. U.S. Army Corps of Engineers*, 701 F.2d 1011, 1029 (2d Cir. 1983) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976)).

Imposition of any injunctive relief is not certain, and arguably must follow a more rigorous analysis following the Supreme Court's decisions in *Monsanto v. Geertson Seed Farms*, 130 S.Ct. 2743, 2756 (2010) and *Winter v. NRDC*, 129 S. Ct. 365, 374, 381 (2008) which reversed Ninth Circuit decisions and clarify that any injunction for a NEPA violation must satisfy the "traditional" four-fact test, including a showing of a likelihood (rather than possibility) of irreparable injury. *Monsanto* further rejected the notion, advanced by some Ninth Circuit decisions, that irreparable injury may be presumed for a NEPA (or other "environmental") law violation, characterizing such "pre-*Winter*" Ninth Circuit reasoning as an unwarranted "thumb on the scales" which "invert[s] the proper mode of analysis." *Id.* at 2757. Thus, an injunction "should issue only if the traditional four-factor test is satisfied" and further elaborating:

> It is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue;

> rather, a court must determine that an injunction *should* issue under the traditional four-factor test set out above.

*Id.* (underlining added, italics in original). Even should they prevail on some aspect of the merits, Plaintiffs would face a difficult and steepening burden in seeking injunctive relief.

Plaintiffs should not prevail on their motion as the Travel Plan reflects a reasoned balance of the myriad factors entrusted to agency expertise. However, if the Court disagrees and Plaintiffs seek some form of injunctive relief, it will be necessary to conduct additional proceedings, potentially including an evidentiary hearing, in order to create a sufficient record to safely satisfy *Monsanto* and other applicable law.

## III. CONCLUSION

The Salmon-Challis National Forest Travel Plan strikes a legally-sufficient balance to the contentious issue of designating motorized access opportunity. The Court should deny Plaintiffs' motion, grant Defendants' motion, and affirm the Travel Plan.

Respectfully submitted this 10th day of September, 2010.

/s/ Paul A. Turcke
Paul A. Turcke, ISB #4759
Moore Smith Buxton & Turcke, Chartered
950 West Bannock, Suite 520
Boise, Idaho 83702
Telephone: 208-331-1800
Facsimile: 208-331-1202
pat@msbtlaw.com

Of Attorneys for Amici Recreation Groups

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 10th day of September, 2010, I filed the foregoing electronically through the CM/ECF system, which caused the following counsel to be served by electronic means, as more fully reflected on the Notice of Electronic filing:

Kevin E. Regan
kregan@earthjustice.org

Todd D. True
ttrue@earthjustice.org

Lauren M. Rule
lrule@advocateswest.org

Brian M. Collins
brian.m.collins@usdoj.gov

/s/ Paul A. Turcke
Paul A. Turcke, ISB #4759
Moore Smith Buxton & Turcke, Chartered
950 West Bannock, Suite 520
Boise, Idaho 83702
Telephone: 208-331-1800
Facsimile: 208-331-1202
pat@msbtlaw.com